Wallace A. Buck and Naomi B. Buck v. Commissioner.
Buck v. Commissioner
Docket No. 1898-63.
United States Tax Court
T.C. Memo 1967-27; 1967 Tax Ct. Memo LEXIS 233; 26 T.C.M. (CCH) 147; T.C.M. (RIA) 67027; February 15, 1967
Marvin T. Bornstein, for the petitioners. George P. Adinamis, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined the following deficiencies in income taxes and additions to tax: Addition to Tax
Sec. 6653(a),
Year
Income Tax
I.R.C. 1954
1956
$14,329.18
$716.46
1957
13,770.67
688.53
1958
13,323.77
666.19
1959
4,119.64
The sole question for decision is whether petitioners sustained a loss upon the sale or exchange of stock in Lincoln Laboratories, Inc. and other assets which qualified as a theft loss under the provisions of section 165(c) of the Internal Revenue Code of 1954. Other issues raised by the pleadings with respect to certain adjustments *234 made by the Commissioner in determining the deficiencies have either been abandoned or conceded by petitioners. Findings of Fact Petitioners, husband and wife, presently reside in Decatur, Illinois. They filed joint Federal income tax returns for the years 1956, 1957, 1958, and 1959 with the district director of internal revenue at Springfield, Illinois. At the time they filed their petition in this proceeding they were residents of Indianapolis, Indiana. Wallace A. Buck, hereinafter referred to as the petitioner, has been in the pharmaceutical business for the past 30 years. He started in this business with Lakeside Laboratories, Inc., of Milwaukee, Wisconsin, in 1936. In 1942, petitioner founded Lincoln Laboratories, Inc. (hereinafter referred to as Lincoln), a drug manufacturing company, in Decatur, Illinois. Lincoln was incorporated in 1943. During the years 1956 through April 30, 1959, petitioner was its president and majority stockholder, and his wife, Naomi B. Buck, its secretary-treasurer. In their income tax returns petitioners reported the receipt of salaries from Lincoln in the following amounts: Year
Petitioner
Naomi B. Buck
1956
$35,000.00
$6,500.00
1957
44,400.00
5,750.00
1958
40,600.00
8,500.00
1959
12,600.00
1,750.00
*235 Prior to April 30, 1959, petitioner owned 18,075 of the 28,000 outstanding shares of common stock of Lincoln, and 500 of the 2,000 outstanding shares of its preferred stock. A conflict arose between petitioner and certain minority stockholders of Lincoln who charged petitioner with mismanagement and misapplication of its assets. As a result of pressure by the minority stockholders, and in order to shift voting control to them, petitioner on March 26, 1959, executed a document entitled "Agreement and Declaration of Trust" under the terms of which his stock was placed in trust. Petitioner's attorney, S. Everett Wilson, was designated trustee with power to vote petitioner's shares. The agreement was signed by petitioner, as "Trustor" and by S. Everett Wilson, as "Trustee", and was to remain in effect for three years unless sooner terminated by affirmative vote of two-thirds of the minority stockholders. A meeting of the board of directors of Lincoln was held on April 24, 1959. Petitioner and his attorney, S. Everett Wilson, were present. At this meeting petitioner was presented with a so-called corporation audit made by a firm of certified public accountants which purported to show *236 that he had made disbursements of corporate funds, totalling $560,000, for salaries, dividends, and expenses during the period July 1, 1952 to March 31, 1959; and petitioner was charged with having improperly or "incorrectly" made at least a substantial portion of such disbursements. An attorney, who represented three of the directors of Lincoln, then stated that he had been authorized by them to inform petitioner that unless he surrendered his Lincoln stock a stockholders suit would be filed against him for mishandling corporate funds. On April 30, 1959, the board of directors of Lincoln met and authorized the filing of a suit against petitioner for an accounting. Petitioner was present and represented by an attorney, Elbert Smith. On the same day, after this action was taken, petitioner and Lincoln entered into a written agreement. Therein, after reciting that certain differences had arisen between petitioner and Lincoln as a result of which its board of directors had authorized the filing of a suit against petitioner for an accounting, that both parties, desiring to avoid litigation, had agreed to settle their differences on the terms and conditions thereinafter set forth, and *237 that petitioner had resigned as president and director of Lincoln, petitioner agreed to surrender to Lincoln the shares of stock of Lincoln owned by him, his wife and his children, to convey certain real estate to Lincoln, and to cause to be delivered to Lincoln a general release releasing Lincoln from any and all liabilities and claims of whatever nature. Lincoln at the same time agreed to execute and deliver to petitioner a general release releasing him, his parents, wife and children, of all claims of every kind and nature, to assign to petitioner the title to a 1958 Cadillac and 1959 Chevrolet Station Wagon (subject to existing chattel mortgages assumed by petitioner), to pay petitioner $5,600, and to pay any final judgment, not to exceed $50,000 in the pending case of Savage v. Buck and Lincoln. Pursuant to the agreement of April 30, 1959, petitioner surrendered 18,075 shares of common stock and 500 shares of preferred stock of Lincoln together with other assets and received from Lincoln the consideration specified in the agreement, namely, a general release of all claims by Lincoln against petitioner and his family; title to a 1958 Cadillac and 1959 Chevrolet station wagon, *238 subject to existing chattel mortgages; the amount of $5,600; and the assumption by Lincoln of the obligation to pay any final judgment, not to exceed $50,000, in the pending case of Savage v. Buck and Lincoln, on which obligation Lincoln paid $15,000 on behalf of petitioner. Petitioner also received from Lincoln a life insurance policy having a cash surrender value of $8,000 in which he was designated as the insured. In the latter part of 1959 petitioner asked the prosecuting attorney in the county in which Lincoln is located to bring criminal action against the officials of the corporation. He refused to bring or institute such an action and to accept petitioner's offer to swear out a warrant. In 1959, petitioner also asked the Assistant United States Attorney to bring charges against the officials of Lincoln and he refused to do so. In 1962 or 1963 petitioner filed a civil suit in the United States District Court, Springfield, Illinois, against certain individuals connected with Lincoln. This suit was dismissed by the court. On May 6, 1965, petitioner filed a civil suit against Lincoln in the Sangamon County Circuit Court, Springfield, Illinois, to set aside the agreement which *239 was entered into by him and Lincoln on April 30, 1959. This suit is still pending. On Schedule D of petitioners' 1959 joint return they claimed a long-term capital loss in the aggregate amount of $391,125, composed of the following items: (1)
18,075 Shares Lincoln Lab-
oratories, Inc. 1942-1953@$15.00
share
$271,125.00
(2)
7 acres of land
60,000.00
(3)
500 shares Preferred
50,000.00
(4)
Accumulated Share Pension
Trust
10,000.00
$391,125.00 No cost basis was established for any of these items, nor was any "sales" price set forth in the return. Schedule D also reported a sale of "4 acres", otherwise unidentified, without disclosing dates of acquisition or sale, or cost or sales price, as required, and stated simply that the gain or loss was "none". The foregoing $391,125 capital loss claimed on Schedule D allegedly resulted from the settlement agreement of April 30, 1959, between petitioner and Lincoln. No claim to a deduction for any theft loss was made in petitioners' return. The Commissioner determined that petitioners realized a net long-term capital gain in the amount of $13,345.40 in respect of these assets instead of a loss of $391,125. *240 Opinion RAUM, Judge: The Commissioner's determination of deficiency was based upon a number of adjustments in petitioners' taxable income for each of the years involved. Petitioners have now abandoned objection to all of the adjustments except one, namely, the disallowance of a $391,125 deduction for 1959 which was claimed on the return as a long-term capital loss. They now seek this deduction as a "theft" loss. The record before us is highly confused and is in an unsatisfactory state. The burden of proof is upon petitioners, and we are satisfied that it has not been carried. Petitioners have not only failed to prove that they sustained a loss in the amount claimed, or in any amount, but they have also failed to establish that the loss, if any, was one that arose from "theft". To show that any loss was realized petitioners must establish that the adjusted basis of the assets transferred to Lincoln exceeded the consideration received in exchange therefor. Petitioners submitted no evidence whatever as to the basis of the assets; and even if the unexplained basis used by the Commissioner in his determination be accepted, [1] petitioners have produced no convincing evidence that *241 the consideration received was less than that basis. The record shows that petitioner received an equity in two automobiles, $5,600 in cash, an interest in a life insurance policy with a cash surrender value of $8,000, and an agreement to pay any final judgment against him (not in excess of $50,000) in litigation in which he was a party defendant, in respect of which Lincoln actually paid $15,000 on his behalf. In addition, Lincoln agreed to release petitioner and his family of all claims which it might hold against them. We cannot treat the latter as being without substantial value in view of the charges of the minority stockholders relating to the misapplication of large amounts of corporate funds during the years 1952-1959. Except for petitioner's self-serving statements, which we found unconvincing, there is nothing in the record to show that these charges were without foundation. In these circumstances we conclude that petitioners have failed to prove that the consideration received was less than the basis of the assets transferred, and therefore we must uphold the Commissioner's disallowance of any deduction in respect of a claimed loss. Petitioners have made no separate argument *242 contesting the Commissioner's involved determination that $13,345.40 was includable in their 1959 income as a result of long-term capital gains, and it must therefore be approved. Moreover, apart from petitioner's failure to establish the existence of any loss, no "theft" has been proved. The word "theft" connotes larceny, embezzlement, extortion, or some related criminal offense, and on this record we cannot find any criminality on the part of those who dealt with petitioner in the transaction before us. It is apparent that petitioner was distraught and even at the trial was sincerely and deeply disturbed about the matter. It seems clear that he was emotionally involved. But we cannot say that the transaction was anything more than petitioner's yielding to firm pressures that were plainly being exerted to oust him from control of the corporation and to seek restitution for his alleged misapplication of funds. It may *243 well be that some of the claims made against him were exaggerated or excessive, but negotiations between parties are often characterized by excessive demands, ultimatums, etc., that may operate to the disadvantage of the weaker party. However, something more is required if there is to be a "theft". There must be a criminal act, and we cannot find any criminality here. There appears to have been a genuine dispute between the parties, and petitioner was represented by counsel in the critical meetings in which he yielded to the demands of the other stockholders. We conclude that petitioners have failed to prove that there was a "theft". Decision will be entered for the respondent. Footnotes
1. Petitioners on brief state that they do not challenge the Commissioner's determination in this respect, which uses a basis of $1,600, and $7,365 for the two parcels of real estate which appear to be involved, and a basis of $133,678.33 for the Lincoln stock.↩